# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JOEL D. RHODES,**

        **Petitioner,**

    **v.**                            **Case No.  13-C-0161**

**MICHAEL MEISNER,**

        **Respondent.**

---

## DECISION AND ORDER

Joel Rhodes has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He was convicted in a Wisconsin trial court of one count of kidnapping and one count of aggravated battery.  On the kidnapping count, the trial court sentenced him to twenty-five years of confinement in state prison and five years of extended supervision.  On the aggravated battery count, the court sentenced him to ten years of confinement and five years of extended supervision.  In his petition, Rhodes alleges three grounds for habeas relief: (1) that he did not knowingly and intelligently waive his Sixth Amendment right to counsel at trial; (2) that even if his waiver was valid, he was denied his right to counsel because he was not allowed to revoke his waiver; and (3) that he was denied his right to counsel when the county jail prevented Rhodes from meeting with a lawyer during the weekend before his trial commenced.

## I.  BACKGROUND

In 2002, Rhodes was charged with two counts of kidnapping.  He retained Peter Kovac as trial counsel.  A jury acquitted Rhodes of one of the kidnapping charges, but a different jury convicted him of the other.  When he appealed the conviction, Rhodes

argued, among other things, that Kovac had been ineffective. However, the court of appeals did not reach this issue because the state conceded that Rhodes's conviction had to be vacated on other grounds. The case was remanded for a new trial.

On remand, the state public defender appointed Richard Kaiser to represent Rhodes, and the state filed an amended information to add an aggravated battery charge to the remaining kidnapping charge. The trial of both charges was scheduled to begin on Monday, May 7, 2007.

On March 13, 2007, Kaiser filed a motion on behalf of Rhodes indicating that Rhodes wished to represent himself. The trial court began a hearing on the motion on April 2, 2007, but then adjourned the hearing to give Rhodes more time to consider whether he truly wished to proceed pro se. The trial court resumed the hearing on April 6, 2007, and engaged in a colloquy with Rhodes to ensure he was knowingly and intelligently waiving his right to counsel and electing to proceed pro se. Rhodes answered all of the judge's questions in a way that indicated his waiver was knowing, intelligent, and voluntary. However, at the conclusion of the colloquy, as the judge was handing a waiver form to Kaiser so that Rhodes could fill it out and sign it, the following exchange took place:

> THE DEFENDANT: Judge, I want to say one more thing. I was in the process of hiring Attorney Kovac but I don't know what happened. He here in the courtroom today.

> THE COURT: Well, he was here in the courtroom the other day earlier this week the same day that we discussed this for the first time. I don't know what that means.

> You had—you had tried to hire him before. What does that mean?

> THE DEFENDANT: I don't know if he taking the case or not. I don't know if he—I don't know if he's taking the case.

THE COURT: Well, Mr. Kovac—I'm not one that likes to play games. What are we doing here? Are you here because you have another matter before this Court or are you here because you like to listen to the Court or you like to see what's going on or what? Please tell me.

MR. KOVAC: I'm here only this morning because of Mr. Rhodes.

THE COURT: And why is that?

MR. KOVAC: He asked me to be here and I said—

THE COURT: Oh, he did ask you to be here. Did he ask you to be here the other day?

MR. KOVAC: Yes, he did.

THE COURT: And for what purpose?

MR. KOVAC: Well, let me say this, Judge. I know from what you said last time you thought that Mr. Rhodes was—or you suggested that he might be playing games and trying to build in some record for appeal.

THE COURT: Yes, I think that's an inference that one reasonable person could at least conclude. I'm not saying that that is my opinion, but I think someone could draw an inference here as to what's going on based upon what Mr. Rhodes has done. But, you know—

MR. KOVAC: I just want to assure you, I understand that that's an inference that you might draw. But I've known Mr. Rhodes for many years now, and I can assure you that that's not his strategy. He's a very bright person, and I think that during the time he's been in custody that he has matured.

He is—actually, he's very well read, not just legal things but I know I've given him things that he has read that have nothing to do with the law. He sincerely wants to litigate this case at trial and win at trial, at least—that's not my inference, that's my conclusion from that. So this is not something where he's trying to play games.

I'm concerned about doing the—I had two concerns that I expressed to Mr. Rhodes, the least important one is financial. What I'm more concerned about is being able to prepare for the case. I have seen that the government has now changed its strategy from the first case.

I tried the case the first time.

THE COURT: Yes, I know.

MR. KOVAC: And things have changed, as I understand it, from the government's perspective as to how they want to proceed. There are—

Anyway, what I told him was I—just because of prior relationship I had with him, quite frankly, my affection for Mr. Rhodes, I'd love to do it, but I don't want to—I told him there are other things to prepare for that I can't—I can't be fairly prepared to try the case on May 7. So I let him know that.

I will just for—I have—

Mr. Rhodes has been talking to me and I have suggested to him that the best thing to do is to resolve the case without a trial, sort of along the line that he did in Federal court. I don't know whether the government is willing to do that. I mean, I have some knowledge of some offer. I think that they are—I don't want to say any specifics, and just from what I know about the case, it seems to me that they're close but not yet there.

I have also expressed to Mr. Rhodes that I think Mr. Kaiser has done very good work for him in the Federal court and in this Court.

But anyway, that's—I mean, that's where I am on this matter.

THE COURT: Well, have you been retained in this case?

MR. KOVAC: I have not been—I mean not—I was retained before but then I was relieved and he had other counsel on appeal and then when it came back I wasn't retained.

THE COURT: You have not been retained in this case?

MR. KOVAC: I have not been retained in this case. Mr. Rhodes has told me that there are certain things, that he believes he will be able to do that. But as I said before, money isn't the issue, as far as I'm concerned; it's just the idea of I would need to be able to prepare for trial and more hopefully be able to resolve the case without a trial.

THE COURT: All right.

(Tr. of April 6, 2007 Hearing [ECF No. 14] at 23–27.) By this time, Rhodes had signed the

written waiver form, indicating that he still wished to waive his right to an attorney and to

proceed pro se, and the form had been returned to the judge. The judge reported that

4

Rhodes had signed the form and continued to ask Rhodes questions to ensure that he still wished to proceed pro se. Rhodes answered all questions in a way that made clear he wished to proceed pro se and that his decision was knowing, intelligent, and voluntary. Neither Rhodes nor the judge made any further comments or asked any questions about Kovac's presence in the court or Rhodes's desire to retain him. The judge then granted Rhodes's request to represent himself and discharged Attorney Kaiser.

At this point, the prosecutor raised the question of whether someone—either Kaiser or Kovac—should be appointed as Rhodes's "stand-by" counsel. (Id. at 31–32.) Kaiser responded to the prosecutor's request by stating that it would inappropriate to have him serve as stand-by counsel, as Rhodes no longer trusted him. Kaiser also noted that it appeared that Rhodes had the ability to hire his own attorney and suggested that it might be appropriate to have Rhodes hire Kovac as stand-by counsel. (Id. at 33.) The judge stated that he would not appoint stand-by counsel. He noted that Rhodes and Kaiser had differences, and Rhodes agreed that Kaiser should not be appointed stand-by counsel. The judge did not discuss the possibility of appointing Kovac as stand-by counsel. (Id. at 33–34.)

On April 18, 2007, Rhodes wrote a letter to the court in which he stated that he had "authorize[d] attorney Peter Kovac to speak on [his] behalf" and "to meet with [the court] and [the prosecutor] to discuss various issues relating to my upcoming trial." Rhodes added that if the trial court agreed to such a meeting, he would not need to be present. (Resp.'s Record Supp., Attach. 2, ECF No. 18-2.) On April 24, 2007, Kovac filed a letter stating that Rhodes had asked him to serve as trial counsel but that he could not be prepared to try the case on May 7. Kovac requested an adjournment of the trial so that he

5

could prepare and appear as counsel of record. Kovac reminded the court that, although he was not yet counsel of record for Rhodes, Rhodes had filed a letter with the court authorizing Kovac to speak on his behalf. Kovac concluded with a request that the court hold a conference on the matters raised in his letter. (Rhodes Appx., Attachment E, ECF No. 14 at pp. 57–59.)

On May 1, 2007, Rhodes wrote a second letter to the court describing problems with his trial preparation. Rhodes added that he that he had asked Kovac to "come in and assist" him and that Rhodes had learned from Kovac that the court would not delay the trial. Rhodes reiterated that he needed more time to prepare his case and that he was requesting that the trial be postponed. (Rhodes Appx., Attachment C, ECF No. 14 at pp. 63–68.)

On May 3, 2007, Rhodes wrote a third letter to the court which was filed on May 4, 2007. He again described the problems he was experiencing in preparing for trial. At the end of the letter, Rhodes indicated that he no longer wanted to proceed pro se and that he would like the court to postpone the trial so that Kovac could prepare and serve as trial counsel:

> I now better appreciate the difficulties of representing myself. I do want the assistance of a lawyer. I do have a lawyer, Mr. Kovac, who is willing to represent me. But he had previously advised me and the Court that he can not be adequately prepared for a May 7 trial.
>
> . . . . Please allow me to have Mr. Kovac represent me at trial.

(Rhodes Appx., ECF No. 14, at p. 62.)

On the first day of trial, Kovac filed another letter, stating that he "remain[ed] willing to represent Rhodes at trial as soon as [he] can ethically do so." (Resp.'s Record Supp.,

Attach. 3, ECF No. 18-3.)  Kovac also notified the court that Milwaukee County Jail personnel had prevented him from visiting with Rhodes throughout the preceding weekend, thus impeding Rhodes's trial preparation.  (Id.)

Before jury selection began, the trial court addressed the issues raised in the letters filed by Rhodes and Kovac over the prior weeks.  This resulted in a lengthy exchange, in which a number of issues relevant to the present habeas petition were discussed.  First, the trial court discussed and rejected Rhodes's request to have Kovac represent him and to adjourn the trial:

> [THE COURT:] Now . . . I want to bring up some additional items in that regard because you also infer at least in your letter of May 3 that Mr. Kovac is willing to represent you, but he's not going to be prepared for the May 7 trial.  Now, in reviewing the file and getting ready for this trial, I again read through the paperwork, and there's a lot of it, that transpired.  But one [of] your post-conviction motions was that you were alleging that Mr. Kovac did not effectively represent you.  In other words, you maintained on at least one or two instances that he was ineffective.  One I know specifically dealt with his cross-examination of a witness, I believe it was Detective Stanaszak, that purportedly opened the door for other evidence to come in.  That was a big issue that you had raised in your appeal.
>
> Also, there was reference in an affidavit that you made that Mr. Kovac told you or advised you not to testify at your trial, which apparently you did not, and apparently it was based upon what he told you.  Therefore, again, you were challenging him.
>
> Now after the fact, months later, apparently Mr. Kovac has been in contact with you—again, I'm not sure what the relationship is, I just see that he just walked in—but I find it ironic that now the Friday before trial is to begin on Monday you tell me that Mr. Kovac is now willing to represent you.
>
> I say this because I want the record to be clear on this and that any appellate court reviewing this take into account the eccentric nature of this whole situation.  It's bizarre as far as the court's concerned.
>
> You chose of your own volition, which is your constitutional right to do, to chose to represent yourself; that is despite the Court's initial admonitions to you and caution to you that it is very difficult for anyone to represent

themselves, let alone a layperson. And as the saying goes obviously one who represents himself, has a fool for a client. Well, sometimes that's true, sometimes it isn't.

But we are going to proceed with this trial today and I want the record to reflect that what I believe is a situation here that is something that I don't want an appellate court to look at without fully understanding the dynamic of this situation. Again, I cautioned you about this, I cautioned you how a lawyer might be able to do things where you, as a layperson, might not be able to, certainly in the area of cross-examination, certainly in the area of trial preparation and so on.

However, even after being given a few extra days to think about it that same week when we did have the hearing, you still maintain that obviously you wanted to represent yourself.

I would also point out—because I read again Mr. Kaiser's motion on that—explaining how skilled you were, how you had obviously been involved in the first trial and certainly are capable of representing yourself; I have also learned that you have written a book and it's been published. I would venture to say of all the people that are in here you are probably the only author amongst us. You are probably the only author that's in the jail. I would venture to say that you are probably the only author in this building and in the courthouse. I have never written a book. And yours has been published. So I certainly think that goes to show how capable you are.

Certainly no one knows this case better than you do. And I just don't want the record to appear that we're proceeding here without you having the right or the benefit of counsel. [The prosecutor] had asked that Mr. Kaiser remain on as stand-by counsel, he did not want to do that; and in view of the circumstances I don't think you wanted him to stand by either. So it is what it is and you are representing yourself at your own choosing and we are going to proceed.

I will obviously try and maintain a good record here, I will give you what opportunities and what latitude I can, but you are to obviously conduct yourself in a professional way and to present evidence in a proper way and to conduct yourself in an appropriate manner. Do you understand?

MR. RHODES: Yes. Can I say a few more things on the record here.

(Tr. of Jury Trial, May 7, 2007, AM Session, at 18–21, ECF No. 16-1 at 39–42.)

Case 2:13-cv-00161-LA   Filed 03/12/14   Page 8 of 28   Document 20

Rhodes proceeded to discuss an issue he had been having with obtaining an item of potentially exculpatory evidence from the prosecutor. At this point, the judge noted that Kovac was trying to get the court's attention, and the conversation turned to Rhodes's relationship with Kovac and the jail's refusal to allow Kovac to visit Rhodes during the preceding weekend:

> THE COURT: Mr. Kovac is motioning out in the gallery. Mr. Kovac, you are not the attorney of record here, so I am not going to turn this matter over to your involvement in this case because you are not involved in it. And I don't know what relationship you have with Mr. Rhodes, that's between you and he. But Mr. Rhodes, as I said, has requested to represent himself, that is his right and the court has allowed it after being satisfied that I complied with the requirements under the law and being satisfied in my own mind that he is capable of representing himself.

> MR. RHODES: Can I say something?

> THE COURT: Yes.

> MR. RHODES: [The prosecutor] came to see me and said that he was going to ask for me to have side bar counsel, I didn't want no public defender and I did not want no Kaiser, so I paid Kovac for legal advice, and that's why he been coming to see me, but the jail said he can't come and see me no more.

> THE COURT: When did they say that?

> MR. RHODES: There's a big sign down there that says he can't come and see me.

> THE COURT: When did that—

> MR. RHODES: Ask your bailiffs. There is a sign down there that says Mr. Kovac cannot come in here. Ask him. He will tell you they turned him around. The private investigator came yesterday and he said you make sure you raise that issue that they say Kovac cannot come and see you no more.

> THE COURT: Well, as far as I'm concerned he is certainly allowed to visit you. I don't know what's going on with the jail. I don't want to try this case a third time. Mr. Kovac is not the attorney of record. They may have some rules in terms of what type of a contact you have with someone who

9

is not your attorney. He is an attorney, though, and I believe there's case law on that an attorney is entitled to see somebody. Now, I don't know what the circumstances are at the jail, I don't tell the sheriff what to do. I can only hope that he acts with some degree of prudence and judgment so as not to give you another issue on appeal. That is not this Court's purpose. And as far as I'm concerned, the Court has done nothing to stop this and I'm telling the jail not to either. We're at this point in the proceedings that it would be foolish if he has been seeing you over the past months now all of a sudden to prohibit you from doing so. I don't know what those are, I will try and find out through my bailiffs and we'll try and address that. All right. Is there anything else?

(Id. at 22–24, ECF No. 16-1 at 43–45.)

The parties and the court proceeded to discuss other matters. One of the matters

Rhodes raised was his request for an adjournment, which the court denied:

> MR. RHODES: In this letter I asked you for an adjournment so I can properly prepare? You not going to give me that? I just want to know that.
>
> THE COURT: No, I'm denying the adjournment because of, specifically, your motion to allow you to represent yourself was heard back in March. You apparently had been thinking about this for some time and you said you were going to be prepared for the trial. So your motion to adjourn is denied.
>
> MR. RHODES: I had got four new witnesses that I had to prepare for on the 6th, so that ain't even—that's 31 days that I had to prepare; and it was hard being by myself, that's why I brought Kovac in because don't nobody respect you when you going pro se. They think that's arrogant. I asked for—
>
> THE COURT: I didn't hear you make that statement to me when we took this motion up when you wanted to represent yourself, so don't—don't go down that road, Mr. Rhodes, at this point.

(Id. at 49–50, ECF No. 16-1 at 70–71.)

The judge then returned to the topic of whether Kovac would be allowed to

represent Rhodes, although by that point Rhodes was asking for an adjournment not

because he wanted to give Kovac time to prepare, but because Rhodes needed additional

time to prepare to represent himself:

10

[THE COURT:] See, what I want the appellate court to understand—because I'm sure depending upon the outcome of this trial that this is going to be an issue—I want the appellate court to understand, as I said earlier, that he had Mr. Kovac represent him in two cases, this one and then on the other count for which he was acquitted.

On this case on appeal, on two grounds he argued that Mr. Kovac was ineffective as his counsel, significant issues as I read them that really weren't addressed by the appellate court, because they ultimately reversed this on the issue of the selection of the jury.

He did not have Mr. Kovac representing him after the appeal.

In addition, on the appeal Mr. Anderegg was the initial attorney, and then Mr. Hartley came on. So he had two different attorneys on the appeal. Mr. Hartley prevailed. He was not appointed to represent him on this—I'm not sure what the protocol is at the public defender's office—but Mr. Kaiser was. I believe Mr. Kaiser had represented the defendant in federal court. He didn't want Mr. Kaiser to represent him. He didn't want, apparently, an attorney before Judge Flanagan; however, I see from the court minutes Mr. Voss is representing him in that case.

So this is a situation where you can't have it both ways, Mr. Rhodes. On the one hand you ask to represent yourself. Because of the law and what I feel was a record that established that you could represent yourself, because it is your constitutional right, I allowed you to do that. You are not going to argue the other way now that you want someone to represent you on the day of trial.

MR. RHODES: I'm not saying that. What I'm saying is I asked for a computer so I could get the printout of [a transcript of a phone conversation.[1]]

THE COURT: I don't provide computers around here, Mr. Rhodes.

MR. RHODES: That ain't even what I'm saying.

_____

[1]What Rhodes is referring to is the prosecutor's providing Rhodes with a computer file containing a recording of a conversation. Rhodes was trying to explain to the judge that he needed a functioning computer in order to access the recording and transcribe it. Rhodes had previously explained this to the trial judge in his May 3 letter. (Rhodes Appx., ECF No. 14 at p. 62.)

THE COURT: I'm lucky that I have one myself, and that's one that operates.

MR. RHODES: But for me to prepare for trial I had to transpire [sic] transcripts of that phone conversation. How can I if I never got the laptop? Kovac brought me one. But somehow it mysteriously broke in '05. So they told me in order for them to give me a computer, I gotta get it from a lawyer.

THE COURT: Well, apparently this is a grand conspiracy against you, Mr. Rhodes. The only thing I can tell you is that I have no ax to grind with you, you are going to get a fair trial, I have been very patient to this point, I will continue to be so long as you conduct yourself in a responsible manner. When you go beyond that point, or [the prosecutor] does, then I will address it with each of you. I am going to expect the same from both of you. This trial is going to move forward and we're going to start now, so you can go and get the jury.

(Id. at 50–52, ECF No. 16-1 at 71–73.)

Shortly after this exchange, Rhodes asked whether Kovac could serve as stand-by counsel, and the court denied the request:

MR. RHODES: I have a quick question. You not going to let Kovac be my stand-by counsel, and I paid him to be my stand-by counsel? You not going to give me that right?

THE COURT: Not at this point.

MR. RHODES: Even though the D.A. requested that? He told me that that's what he was going to ask you and I didn't want you to give me no public defender.

THE COURT: [The D.A.] asked me if Mr. Kaiser could be your stand-by counsel. Now, just a second, Mr. Rhodes. I'm going to say it a third time. Mr. Kovac represented you in the first two trials on the two counts that you were charged with. You represented in your appellate papers that Mr. Kovac was ineffective for two reasons I pointed out earlier. Mr. Kovac did not represent you in this case after it came back on appeal. He's indicated that he would not be prepared to try this case and now you are telling me you want him to act as stand-by. I'm not going to allow it under these circumstances.

And I guess if an appellate court says I'm wrong, then I—you know, we'll accept that. But in this Court's opinion, based upon this record, Mr.

12

Kovac is not going to serve as your stand-by counsel. You are the one that wanted to proceed pro se. And I'm not going to have someone that has represented to this Court that they weren't prepared on this case and has already been accused of being ineffective, we're not going to have all of these issues enter into it. All right. Get the jury, please, for the fifth time.

(Id. at 55–56, ECF No. 16-1 at 76–77.)

Before the jury was brought in, the judge returned to the matter of Kovac's relationship with Rhodes and the jail's refusing to allow Kovac to see Rhodes:

[THE COURT:] The other thing is right at the break Mr. Kovac came in and filed with the Court another letter, which is dated May 6, but he just filed it within the last 15 minutes, directed to me.

. . . .

Okay. Mr. Kovac says that Mr. Rhodes is a client of his; however, he is not currently attorney of record, but his representation includes giving him advice and counsel about the case and other matters. He particularly needs my advice and counsel on the above case as he will be acting as his own attorney at trial. He has asked me to represent him at trial at the above case, but as I previously advised the Court and Mr. Rhodes, I did not believe that I can ethically handle a trial on the scheduled trial date of May 7, I have not had adequate time to review all the new material that the government is planning on using at trial. Nonetheless, Mr. Rhodes still wanted me to handle the trial for him. While I have been regularly meeting with Mr. Rhodes in jail, I had planned to spend a substantial amount of time with him over this weekend before trial. We were to discuss how he should handle himself at trial. We were to discuss motions in limine, jury voir dire, opening statements, how to make objections, how to cross-examine and various other aspects of the trial. We were also to discuss the advisability of my representing him at trial even without proper representation. The government has interfered with this. He's being precluded from seeing him, and so on and so forth, and the letter will be made a part of the record.

Again, the Court's ruling will remain the same. Again, the Court believes that there are games going on here, which I am not going to put up with because I'm not going to be caught in the horns of the dilemma here.

The defendant, again, made an intelligent and responsible decision to represent himself, which he is entitled to do. I covered that on the record during the hearing that I held a few days after I had cautioned him about it; again, the motion by Mr. Kaiser addressed this, and this letter by Mr. Kovac,

while I have made it a part of the record because he filed it with the Court, I think is an example of just what—what's going on here. You can't have your cake and eat it too, Mr. Rhodes. I will allow you to see Mr. Kovac, I have instructed the authorities, that is, my staff, to advise the jail that he may see you, and as I said we're going to proceed. We've got at least 12 or 14 witnesses, 12 of them are in custody, some of them may even be in federal custody, many of them have been brought from outside Milwaukee. I am not even sure if they've come from outside Wisconsin. But we are going to proceed. All right.

(Id. at 57–59, ECF No. 16-1 at 78–80.) At this point, the jury was brought in and the trial began.

At the beginning of the second day of trial, Rhodes renewed his request to have Kovac serve as stand-by counsel, and again the judge denied the request. But it seems that the judge misunderstood Rhodes's request as another request for Kovac to serve as trial counsel rather than stand-by counsel:

THE DEFENDANT: I have an issue I want to raise.

THE COURT: All right. What is it?

THE DEFENDANT: Yesterday he was speaking like Kovac like not representing me, but I sent you a letter on the 18th giving him permission to represent me. You talked to him yourself about my case. So I don't understand why you not letting him be side counsel?

THE COURT: All right. Let me again state for the record—and again I'm speaking to the Appeals Court if they have to review this—this Court identified some time ago when Mr. Rhodes brought this up through his former attorney, Mr. Kaiser, that the Court is very familiar with the record, and the Court believes that the defendant is trying to manipulate the record by what he is doing in terms of his representation. I'm convinced of that based upon his actions and not only what's going on in these proceedings but what transpired at his previous trial.

Mr. Kovac is not your—was not your attorney. Mr. Kaiser was. You asked that Mr. Kaiser not represent you because you wanted to be represented by yourself. You were allowed to do that after the Court conducted a hearing under the law which I found based upon your answers

14

and the record that you were entitled pursuant to your constitutional rights to represent yourself.

There was no mention of you obviously wanting Mr. Kovac to represent you. Again, I reiterate but I emphasize that Mr. Kovac represented you in the first case. Subsequent to that on the appeal and even before the formal appeal went through the Appellate Court in post-conviction motions you challenged Mr. Kovac's effective assistance of counsel on two issues.

There was a hearing before Judge Hansher [another trial judge]. The transcript is in the file. I read that. It was clear to the Court what was happening, and I don't know what Mr. Kovac's motives or his actions are in this case, but one of the issues you raised is that you did not testify in the first trial because of the advise [sic] that Mr. Kovac had given you. You criticized him which was your right raising the issue of his ineffective assistance on that issue.

Judge Hansher heard testimony on that and made a ruling. It should be noted, however, that in the second trial you did testify. There was no mention of anything else regarding that, and ultimately when the matter came back, Mr. Kovac did not represent you because you in effect had, I believe, obtained other counsel.

Now, to suggest because you want to make a record which I'll allow you to do that the Court is not treating you fairly here because supposedly you wanted Mr. Kovac roughly two weeks before trial to represent you is just not going to cut it in this Court's opinion.

I know what's going on, Mr. Rhodes. You can make your record, and obviously I'm basing this on what I believe you're doing and what the Court believes is the right thing to do here. If I thought for one moment you could not effectively represent yourself, I would not have ruled as I did. I was satisfied based upon your answers and the record that was made back on the hearing in March that under the law could represent yourself [sic].

You made that decision. I cautioned you against it. I cautioned you and advised you how difficult it is to cross-examine witnesses. You indicated that you would be prepared. That there wasn't going to be a need for an adjournment. In reality the Friday before the trial was to start, which was last Friday, Mr. Kovac at about two or two-thirty, maybe three o'clock—I have no idea—dropped off a letter with my clerk which I read where he for the first time actually it's my understanding wanted to step into the case and represent you. He sent and delivered a letter to the Court yesterday just prior to us selecting a jury.

I think there is games [sic] being played here. We've made a record, and I'm satisfied that I'm doing the right thing here. You are not going to manipulate the system. I have had this happen before with many defendants where they want to fire their attorney on the day of trial. This is no different. It's just a little different twist here. You have been effective on how you've proceeded so far.

(Tr. of Jury Trial, May 8, 2007 at 2–5, ECF No. 16-2 at 40–43.) Following this, Rhodes

again asked to reinstate his right to counsel:

THE DEFENDANT: I just want to say I revoke myself to represent myself in this case 'cause I am not doing what I suppose to do in this case. Yesterday I did not represent myself right, and I feel like if I go on, I'm going to mess this case up by not asking the right questions to the witnesses. Every time Kovac come back he tell what I did wrong.

I mean, this is just a lost cause. I'm not representing myself right. I thought I could. I went through the trial yesterday. I found out I couldn't. So I feel like I have the right to say I revoke the right to represent myself.

(Id. at 6–7, ECF No. 16-2 at 44–45) The court responded by informing Rhodes that he was

"a day late and a dollar short." (Id. at 7, ECF No. 16-2 at 45.)

The next day, Rhodes again asked for stand-by counsel, this time indicating that he

would accept someone other than Kovac, but still the judge denied the request:

MR. RHODES: Your Honor, I ask you for side counsel. You ain't give it to me. What if I miss something? I don't got nobody. What if I miss something? What if I forget to ask something? He can only come in the back and tell me what I did wrong.[2]

THE COURT: Mr. Rhodes—

MR. RHODES: That's too late. I already said it for jury. I can't answer it for the witness. He says you should have said this. You should have said that. Well, he should be right here. I should have side counsel.

---

[2]"He" appears to be a reference to Kovac, who was sitting in the gallery and was trying to assist Rhodes in representing himself.

THE COURT: Mr. Rhodes, you specifically did not want stand-by counsel.

MR. RHODES: Right. I didn't at first. When I found out I could not handle this case by myself, I asked you for it. I feel like I had that right.

THE COURT: And because of the unusual circumstances that we have here with what I believe has gone on in the past and what I bleive [sic] is going on now I've addressed it this way, and I think it was the appropriate way to do it because Mr. Kovac has communicated in letters that he's not prepared, and I am not going to appoint someone or allow them to represent you when they're not prepared and they put that in writing to me. Do you understand?

MR. RHODES: I hear you.

THE COURT: Okay. Now, if somebody disagrees with me on that or says I made a mistake by not allowing an attorney that was not prepared to sit with you, I guess then they can tell me that I'm wrong.

MR. RHODES: I asked for side counsel. I ain't put no name on there.

THE COURT: Yeah. That isn't what you said. I'm not going to belabor this anymore. We got a jury waiting. Is the witness here?

THE BAILIFF: Yes.

THE COURT: Bring out the witness. This is precisely why I did what I did because, Mr. Rhodes, you've been around the block a few times, and you know exactly what you're doing. I've witnessed you throughout these proceedings, and you're as capable as many lawyers that appear in this court, and I'm not saying that just to hear myself talk. You've been as effective as many lawyers that I've seen try cases in the last year before me, and it's certainly not because you're not prepared that you're having difficulty. I cautioned you about representing yourself.

(Tr. of Jury Trial, May 9, 2007, PM Session, at 48–49, ECF No. 16-5 at 71–72.)

On the next day, May 10, 2007, which was the fourth day of trial, Kovac sat at the table next to Rhodes and asked the court for permission to deliver closing argument on Rhodes's behalf. Kovac also indicated that Rhodes wanted him to examine the remaining witnesses. In addressing this development, the trial judge decided to summarize his view

17

of everything that had happened involving Rhodes's request to represent himself and his later request to have Kovac represent him. After he did so, the judge gave reasons for holding Rhodes to his decision to proceed pro se and denied Kovac's request to deliver closing arguments:

> [THE COURT:] Now, under that backdrop I'm being asked and was asked to allow Mr. Kovac to represent him. In this Court's opinion after reviewing the entire record particularly the record on April 6th of this year where I went through very carefully with Mr. Rhodes the pitfalls of representing himself the Court decided not to allow this. I believe I made the right decision based upon the record here, and again that's why I've taken the time this morning to explain that.

> I do believe that this record is being manipulated. This is no different than a situation wherein many times in the past before this Court and other courts as is reflected in many appellate cases that have been decided where defendants are trying to manipulate the system by changing lawyers at the last minute and coming up with circumstances that obviously build in to the record what they know is going to be an appealable issue.

> Now, this Court wants to make it clear I'm not ruling the way I am in order to penalize Mr. Rhodes. Anyone that knows me knows that this is not the purpose of the Court. I'm doing this because I believe under the law he waived his right to counsel. Trial is set. I was told that this was not going to be adjourned, and that he would be ready.

> . . . .

> Now, all of this having been said the bottom line is is [sic] that I am not going to reverse my ruling. I think it would be imprudent and unwise at this point to allow you to step in, Mr. Kovac, and present an argument to the jury because you have not heard all of the evidence and testimony in this case, and that is the ruling of the Court for all of these reasons.

(Tr. of Jury Trial, May 10, 2007, at 21–22, 24, ECF No. 6-5 at 111–12, 114.)

The jury found Rhodes guilty of both kidnapping and aggravated battery. Rhodes moved for post-conviction relief on the ground that the trial court and jail personnel had deprived him of his right to counsel, and the trial court denied the motion. Rhodes

18

appealed, raising the three issues he raises in the present habeas petition. The Wisconsin Court of Appeals affirmed on all issues in a published opinion. <u>See</u> <u>State v. Rhodes</u>, 337 Wis. 2d 594 (Ct. App. 2011). The court first determined that Rhodes's initial waiver of his right to counsel was valid. <u>Id.</u> at 603–06. It then examined Rhodes's claim that the trial court erred in denying his request to revoke the waiver. The court determined that the appropriate legal standard for reviewing a decision to deny a request to revoke a waiver of the right to counsel is abuse of discretion. <u>Id.</u> at 607–08. Applying this standard to Rhodes's request to revoke his waiver of his right to counsel, the court of appeals determined that the trial court had not abused its discretion in denying the requests. The court noted that the timing of Rhodes's request was "a significant factor." <u>Id.</u> at 609. The court concluded that Rhodes had not made his request to revoke the waiver until the Friday before the start of trial. In reaching this conclusion, the court rejected Rhodes's argument that the letters filed by him and Kovac during the month of April counted as earlier requests to revoke the waiver. <u>Id.</u> Having concluded that Rhodes had not made his request until the Friday before trial, the court of appeals noted that the trial court properly gave weight to the untimeliness of his request. <u>Id.</u> at 610.

The court of appeals went on to note that "[t]he trial court did not . . . base its decision solely on administrative concerns engendered by the timing of Rhodes's efforts to reinstate the right to counsel." <u>Id.</u> at 610–11. Rather, the trial court also based its decision on the fact that Rhodes was "engaged in gamesmanship over his representation." <u>Id.</u> at 613. The court of appeals determined that the record supported the trial court's conclusion that Rhodes was engaged in gamesmanship over his representation. <u>Id.</u> at 611–16.

19

Case 2:13-cv-00161-LA   Filed 03/12/14   Page 19 of 28   Document 20

Finally, the court of appeals turned to Rhodes's claim that the county jail deprived him of his right to counsel by preventing him from meeting with Kovac the weekend before his trial began. The court of appeals determined that the two cases cited by Rhodes in his appellate brief were inapposite, and that Rhodes had failed to sufficiently brief this claim. Id. at 616–17.

Rhodes petitioned for review in the Wisconsin Supreme Court, but that petition was denied. He then commenced the present action.

## II. DISCUSSION

I will begin by assuming that Rhodes's initial waiver of his right to counsel was valid and turn to the question of whether his Sixth Amendment right to counsel was violated when the trial court denied his request to reinstate his right to counsel. The Wisconsin Court of Appeals adjudicated this claim on the merits, and therefore I may grant relief only if the court's adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d).

An initial question is whether the legal standard the Wisconsin Court of Appeals applied to Rhodes's request to revoke his waiver of the right to counsel at trial was contrary to, or involved an unreasonable application of, clearly established Supreme Court law. At the time of the Wisconsin Court of Appeals's decision, the Supreme Court had not explicitly addressed a defendant's ability to re-assert his right to counsel after he had validly waived it. See Marshall v. Rodgers, __ U.S. __, 133 S.Ct. 1446, 1449 (2013). In Marshall,

20

however, the Supreme Court found that a state court does not unreasonably apply federal law when it concludes that a trial court has discretion to determine whether a defendant should be allowed to revoke his earlier waiver and that an exercise of that discretion must be based on the totality of the circumstances, including the quality of the defendant's representation of himself, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay that might reasonably be expected to follow the granting of a request to revoke the waiver. Id. at 1449–50. The standard applied to Rhodes by the Wisconsin Court of Appeals is substantially similar to the standard the Supreme Court found reasonable in Marshall. The court of appeals held that "a defendant's request to withdraw from self-representation and proceed with the assistance of counsel rests in the trial court's discretion," State v. Rhodes, 337 Wis. 2d 594, 607 (Ct. App. 2011), and that the exercise of such discretion must be based on "the totality of the circumstances," id. at 615–16. I conclude that the Wisconsin Court of Appeals's legal standard was not contrary to, and did not involve an unreasonable application of, clearly established federal law as determined by the Supreme Court. However, as explained below, the Wisconsin Court of Appeals's application of this standard to Rhodes's request to revoke his earlier waiver was based on an unreasonable determination of the facts in light of the evidence presented in the trial court.

The court of appeals found that the trial court's denial of Rhodes's request to reinstate his right to counsel was based on two factors: (1) the untimeliness of Rhodes's request, id. at 609, and (2) the trial court's perception that Rhodes was "engaged in gamesmanship over his representation," id. at 613. I will assume that the court of appeals did not unreasonably determine the facts when it concluded that Rhodes did not request

21

to reinstate his right to counsel until the eleventh hour. However, the trial court did not rest its decision on timeliness alone, as the court of appeals recognized, id. at 610–11 ("The trial court did not, however, base its decision solely on administrative concerns engendered by the timing of Rhodes's efforts to reinstate the right to counsel."), and it is the court of appeals's handling of the trial court's second factor that involved an unreasonable determination of the facts.

Here is what the court of appeals had to say about the trial court's second factor:

> The record amply supports the trial court's finding that Rhodes was engaged in gamesmanship over his representation. Rhodes waived his right to counsel on April 6, 2007, stating that he was prepared for trial and could proceed on the scheduled trial date of May 7, 20[07]. Nonetheless, as that deadline closed in, he told the trial court that he wanted: (1) Attorney Kovac to represent him; (2) to represent himself with Attorney Kovac serving as stand-by counsel; and (3) no lawyer, just a computer. The trial court was incapable of satisfying all of Rhodes's mutually exclusive requests. A defendant cannot rely on the right to counsel as a mechanism for imposing impossible duties on the trial court. Moreover, a litigant may not abuse the right to counsel "by repeatedly altering his position on counsel to achieve delay or obstruct the orderly administration of justice."

Id. at 613 (citations omitted). The key finding in this paragraph is that Rhodes had made three "mutually exclusive requests" in an attempt to impose "impossible duties on the trial court" for the purpose of delaying the trial or obstructing the orderly administration of justice. But the record contains absolutely no support for the conclusion that Rhodes had made mutually exclusive requests. Rather, the record is clear that Rhodes had made alternative and consistent requests, which the trial court addressed on the first morning of trial: First, Rhodes asked the trial court to allow Kovac to represent him. When the trial court denied that request, Rhodes, now intending to represent himself at trial, raised an issue he had been having with accessing a recorded telephone conversation he intended

22

to use at trial. He mentioned that a computer he had been using was broken, and that he needed a new one so that he could access the recording, which had been given to him as a computer file. (Tr. of Jury Trial, May 7, 2007, AM Session at 51–52, ECF No. 16-1 at 72–73.) Rhodes raised this issue not with the intention of having the court supply him with a computer, but in support of his request for an adjournment so that he could properly prepare. After the court dealt with the request for an adjournment, Rhodes raised the question of whether Kovac could serve as his stand-by counsel. The court denied that request. (Id. at 55, ECF No. 16-1 at 76.) Thus, Rhodes did not make mutually exclusive requests or try to have the trial court do the impossible in an effort to obstruct the orderly administration of justice. He made three alternative and consistent requests, all of which the court denied. The court of appeals's contrary finding constituted an unreasonable determination of the facts. See Carlson v. Jess, 526 F.3d 1018, 1024 (7th Cir. 2008) (state court's factual finding is unreasonable when there is "nothing in the record to back it up").

Having found that the court of appeals's adjudication of Rhodes's claim was based on an unreasonable determination of the facts, I review the trial court's denial of Rhodes's request to reinstate his right to counsel under the de novo standard of review. Kidd v. Lemke, 734 F.3d 696, 703 (7th Cir. 2013); Carlson, 526 F.3d at 1024. Here, I will continue to apply the abuse-of-discretion standard that the Wisconsin Court of Appeals applied, as the parties seem to agree that that is the appropriate constitutional standard to use when evaluating a request to reinstate the right to counsel at trial, and that standard is consistent with the approach used by the federal courts. See United States v. Leveto, 540 F.3d 200, 207 (3rd Cir. 2008); United States v. Proctor, 166 F.3d 396, 402 (1st Cir. 1999); United States v. Pollani, 146 F.3d 269, 273 (5th Cir. 1998); United States v. Tolliver, 937 F.2d

23

1183, 1187 (7th Cir. 1991); Menefield v. Borg, 881 F.2d 696, 700–01 (9th Cir. 1989);

United States v. Solina, 733 F.2d 1208, 1211–12 (7th Cir. 1984).  Applying that standard,

I conclude that the trial judge abused his discretion when he denied Rhodes's request to

reinstate his right to counsel.[3]

Initially, I note that the trial judge would not have abused his discretion had he

denied Rhodes's request solely because it was untimely.  The cases indicate that a trial

court usually acts within its discretion when it denies a request to reinstate counsel on the

ground that it was made close to the start of the trial or during the middle of the trial.  See

Leveto, 540 F.3d at 207; Pollani, 146 F.3d at 273; Tolliver, 937 F.2d at 1187; Menefield,

881 F.2d at 700; Solina, 733 F.2d at 1211–12.  Here, Rhodes made his request close to

the start of the trial, with the result that the trial judge was not able to address it until the

morning of trial, when witnesses had already been assembled and the trial could not have

been rescheduled without interfering with orderly court administration.  Of course, Rhodes

had made his request before the morning of trial, and Kovac had informed the court of

Rhodes's request almost two weeks before the trial was set to begin.  It was the trial judge

who delayed ruling on the requests until the morning of trial.  But I cannot say that the

judge's having waited until the morning of trial to address Rhodes's request was an abuse

of discretion.  The judge explained that he was busy during the interval between the time

---

[3]Because the trial judge made several rulings concerning Rhodes's right to counsel
shortly before and during the trial, I should make clear that I am reviewing the decision the
judge made on the morning of the first day of trial in which he refused to allow Rhodes to
be represented by Kovac.  I am not reviewing the trial judge's decision denying Rhodes's
request for stand-by counsel or his later decision denying Rhodes's request to have Kovac
deliver Rhodes's closing argument.  As I read Rhodes's briefs, he is not seeking habeas
relief as to those issues.

Case 2:13-cv-00161-LA   Filed 03/12/14   Page 24 of 28   Document 20

he received Kovac's letter and the time of trial, and that because Kovac was not counsel of record he did not put the letter on his "radar screen." (Tr. of Jury Trial, May 10, 2007, at 19–20, ECF No. 6-5 at 109–10.) Although many judges would have addressed the letter before the start of trial, the trial judge's failure to act promptly was not an abuse of discretion. Thus, the trial judge would have been within his discretion to deny Rhodes's request solely because of its untimeliness and the resulting prejudice to court administration.

However, as the Wisconsin Court of Appeals observed, <u>Rhodes</u>, 337 Wis. 2d at 610–11, the trial judge did not deny Rhodes's request on the basis of untimeliness alone. The trial judge also based his ruling on his finding that Rhodes was requesting to reinstate his right to counsel as part of a "game" to "manipulate the record." (Tr. of Jury Trial, May 8, 2007, at 3–5.) The court at multiple points during the proceedings stressed that Rhodes had in his prior appeal challenged Kovac's effectiveness and that this fact rendered Rhodes's new request to have Kovac represent him "eccentric" or "bizarre" or made it an attempt to manipulate the record. (Tr. of Jury Trial, May 7, 2007, AM Session at 18–19, 50–51; Tr. of Jury Trial, May 8, 2007, at 3–5; Tr. of Jury Trial, May 10, 2007, at 22.) But I cannot find anything eccentric or bizarre about Rhodes's request or see how it could amount to a game or an attempt to manipulate the record.[4] Perhaps the trial court was concerned that Rhodes was trying to hire Kovac, whom he had previously alleged was

---

[4]I note that the Wisconsin Court of Appeals had trouble identifying the "game" the trial court thought Rhodes was playing. In the court of appeals's view, the game involved making mutually exclusive requests in an attempt to impose impossible duties on the trial court. <u>Rhodes</u>, 337 Wis. 2d at 613. However, as I have explained, the court of appeals's view is not supported by the record.

ineffective, for the purpose of setting up a future claim of ineffective assistance of trial counsel. If so, the trial court was unreasonably concerned with this possibility. It is true that in his prior appeal, Rhodes challenged Kovac's effectiveness, but that did not imply that Rhodes anticipated Kovac would be ineffective in the retrial. Rhodes challenged Kovac's effectiveness on two issues, and there is no indication that Rhodes viewed Kovac as an incompetent lawyer or expected him to make serious errors a second time. And it is questionable whether Kovac actually did render ineffective assistance in the first trial, as the court of appeals never reached that issue and criminal defendants will often challenge their trial counsel's effectiveness if they have even a slightly colorable basis for doing so.

The only reasonable conclusion that can be drawn from the record is that Rhodes earnestly wanted Kovac to represent him because he thought Kovac would do a better job than he could do himself, not because he was playing games. Therefore, the trial court's finding of gamesmanship was clearly erroneous. A trial court abuses its decision when it bases its decision on a clearly erroneous finding of fact. See, e.g., United States v. Freeman, 650 F.3d 673, 678–79 (7th Cir. 2011). Accordingly, I conclude that the trial court abused its discretion and deprived Rhodes of his Sixth Amendment right to counsel.

One might ask whether, in light of my earlier finding that the trial judge would have been within his discretion to deny Rhodes's request on the basis of untimeliness alone, I should conclude that Rhodes was not deprived of his Sixth Amendment rights. I think the answer is no. When a court reviews for abuse of discretion, it reviews a judge's reasoning process, not merely the outcome produced by that reasoning process. See United States v. Purnell, 701 F.3d 1186, 1189 (7th Cir. 2012) (court reviewing for abuse of discretion asks "whether the [trial] court's reasoning process and result were within broad bounds of

26

reasonableness"). The mere fact that the outcome—the bottom line—reached by the judge is within the range of permissible outcomes is not sufficient to allow a reviewing court to uphold it. This is especially true in a case like this, in which any of the available outcomes (denying the request or granting it) could have been reasonably selected by the judge. In such cases, the reasons given by the judge for making the choice he did determine whether the choice may be upheld. Here, the judge gave two reasons for his choice (untimeliness and gamesmanship), one of those reasons (gamesmanship) was based on a clearly erroneous factual finding, and the judge gave no indication that he would have made the same choice if he had not made the clearly erroneous factual finding. Thus, the clearly erroneous finding tainted the judge's reasoning process, with the result that the ultimate decision must be set aside as an abuse of discretion.[5]

Accordingly, I conclude that the trial court deprived Rhodes of his Sixth Amendment right to counsel. Because this is a structural constitutional defect, it is not subject to review for harmlessness, see, e.g., United States v. Gonzalez-Lopez, 548 U.S. 140, 148–49

---

[5]I add that it seems the trial judge also based his decision on a third factor, which might be described as the "I told you so" factor. See, e.g., Tr. of Jury Trial, May 7, 2007, AM Session, at 20 ("Again, I cautioned you about this, I cautioned you how a lawyer might be able to do things where you, as a layperson, might not be able to, certainly in the area of cross-examination, certainly in the area of trial preparation and so on. However, even after being given a few extra days to think about it that same week when we did have the hearing, you still maintain that obviously you wanted to represent yourself."). The courts that have considered the question have concluded that a constitutional violation occurs when a trial court denies a request to reinstate the right to counsel on the ground that the defendant, having made his bed by electing self-representation, should be compelled to lie in it. See Leveto, 510 F.3d at 208 n.5; Menefield, 881 F.2d at 700 & n.6. Thus, the judge's reliance on this factor, which was an improper factor, is another reason to view his decision as involving an abuse of discretion. See, e.g., United States v. Blitch, 622 F.3d 658, 667 (7th Cir. 2010) (trial court abuses its discretion when it bases its decision on an improper factor).

27

(2006), and Rhodes's petition for a writ of habeas corpus must be granted. Having decided that Rhodes's petition must be granted for this reason, I need not separately consider whether he is entitled to relief on his other Sixth Amendment claims.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the petition for a writ of habeas corpus is **GRANTED**, and that the respondent shall release the petitioner unless the State of Wisconsin retries him within 180 days.

Dated at Milwaukee, Wisconsin, this 12th day of March, 2014.

s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge

28